**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **CADENCE BANK, N.A.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 3:10-cv-1042** |
| | ) | |
| **SABRE DEFENCE INDUSTRIES, LLC;** | ) | **Judge Haynes** |
| **SABRE DEFENCE HOLDINGS, LLC;** | ) | |
| **GUY SAVAGE,** | ) | **Mag. Judge Bryant** |
| | ) | |
| **Defendants,** | ) | |
| | ) | |

---

**MEMORANDUM OF LAW IN SUPPORT OF CADENCE BANK, N.A.'S
APPLICATION FOR TEMPORARY RESTRAINING ORDER**

---

COMES NOW the Plaintiff, Cadence Bank, N.A. ("Cadence" or "Plaintiff'"), by and through the undersigned, and respectfully submits this *Memorandum of Law* in support of its contemporaneously-filed *Application for Temporary Restraining Order.*

## PRELIMINARY STATEMENT

This is a breach of contract case. Cadence filed its *Complaint* on November 4, 2010. (Compl., p. 1, D.E. No. 1.) Defendants, Sabre Defence Industries, LLC ("Sabre"), Sabre Defence Holdings, LLC ("Holdings") and Guy Savage ("Mr. Savage"), were served on November 5, 2010. (Sabre Summ., p. 2, D.E. No. 5; Sabre Summ., p. 2, D.E. No. 6; Holdings Summ., p. 2, D.E. No. 7; Holdings Summ., p. 2, D.E. No. 8; Savage Summ., p. 2, D.E. No. 9.) As of December 30, 2010, Sabre, Holdings and Mr. Savage have not answered or otherwise responded to the *Complaint.*[1]

---

[1] Although Sabre, Holdings and Mr. Savage have not made appearances in the above-styled case, they

## STATEMENT OF THE FACTS

Cadence is a bank. (Compl., ¶ 1, D.E. No. 1; Affidavit of Aubrey G. Oliver, ¶¶ 1-3, attached to contemporaneously-filed *Application* as Exhibit A thereto.) Sabre is a Nashville weapons producer that manufactures military-grade ordnance and commercially-available firearms. (Compl., ¶ 8, D.E. No. 1.) Holdings is the sole member of, and holding company for, Sabre. (*Id.* at ¶ 3; A.G. Oliver Affid., ¶ 5.) Mr. Savage is the owner, president and/or chief executive officer of Sabre, and is the sole member of Holdings, as well as its president and/or chief executive officer. (*Id.*; Compl., ¶ 4, D.E. No.)

Cadence's lending relationship with Sabre began on or about February 7, 2007, when Sabre executed that Commercial Variable Rate Revolving Draw Note, in the original principal amount $2,500,000.00, in favor of Cadence, as amended by that Extension and Amendment to Promissory Note dated March 31, 2008, as further amended by that Extension and Amendment to Promissory Note dated May 31, 2008, as further amended by that Commercial Variable Rate Revolving Draw Note, in the amount $2,500,000.00, executed in favor of Cadence, dated October 24, 2008, as further amended by that Extension and Amendment to Promissory Note dated January 31, 2009, in which the available principal amount was reduced to $2,320,000.00, as further amended by that Extension and Amendment to Promissory Note dated April 30, 2009, in which the available principal amount was reduced to $2,272,000.00, as further amended and restated by that Amended and Restated Promissory Note dated October 30, 2009, as further amended and restated by that Loan and Security Agreement dated October 30,

---

have been represented by Bob Hannon and Jonathan M. Skeeters of Bradley Arant Boult Cummings, LLP, in their communications with the undersigned. Copies of this *Memorandum* will be served upon Messrs. Hannon and Skeeters, the same day of filing, via e-mail.

2009 (collectively, the "Note"). (Compl., ¶ 9, Ex. 1, pp. 1-32, D.E. No. 1-1; A.G. Oliver Affid., ¶ 4.) Holdings and Mr. Savage guarantied Sabre's obligations to Cadence. (*Id.* at ¶ 5; Compl., ¶¶ 12, 14, Ex. 2, pp. 1-12, D.E. No. 1-2, Ex. 3, pp. 1-10, D.E. No. 1-3.)

Sabre executed that Commercial Security Agreement dated February 7, 2007 ("Commercial Security Agreement"), and Sabre and Holdings (and Mr. Savage) executed that Loan and Security Agreement dated October 30, 2009 ("Loan and Security Agreement," collectively, the Security Documents").[2] (A.G. Oliver Affid., ¶ 6.) As reflected in the Commercial Security Agreement Sabre's obligations are secured by certain collateral, namely "all accounts, inventory, equipment, general intangibles and all business assets of any kind now owned or hereafter acquired by debtor and any proceeds therefrom." (Compl., ¶ 17, Ex. 4, p. 5, D.E. No. 1-4; A.G. Oliver Affid., ¶ 6, Ex. 1, p. 3.) Indeed, pursuant to the Loan and Security Agreement agreed to by Cadence, Sabre, Holdings and Mr. Savage, the obligations are secured by "all of [Sabre's, Holdings's and Mr. Savage's] presently owned and hereafter acquired personal property and fixtures, including, but not limited to all:

    (a)    accounts;
    (b)    chattel paper;
    (c)    inventory;
    (d)    equipment;
    (e)    instruments, including promissory notes;
    (f)    investment property;
    (g)    deposit accounts;
    (h)    documents;
    (i)    general intangibles, including payment intangibles;
    (j)    letter of credit rights;
    (k)    supporting obligations;
    (l)    all Government Contracts, as defined herein

---

[2] The Commercial Security Agreement and the Loan and Security Agreement are collectively referred to herein as the "Security Documents."

(collectively the 'Collateral')."[3]

(Compl., ¶ 17, Ex. 4, pp. 8-9, D.E. No. 1-4; A.G. Oliver Affid., ¶ 6, Ex. 2, pp. 3-4.)  The Collateral is perfected by filing financial statements with the Tennessee Secretary of State.  (A.G. Oliver Affid., ¶ 6.)  By contract and Article 9 of the Uniform Commercial Code, Cadence's Collateral necessarily includes all proceeds of the secured property, including but not limited to proceeds from the sale of Collateral, including inventory, paid to Sabre, Holdings or Mr. Savage, proceeds of accounts receivable ("A/R"), as well as other funds collected by Defendants for the sale of other Collateral.

Pursuant to the Commercial Security Agreement, Sabre and Cadence agreed that, "[Sabre] shall, upon [Cadence]'s request, deposit all proceeds of the Collateral into an account or accounts maintained by [Sabre] or [Cadence] at [Cadence]'s institution.  (*Id* at ¶ 6, Ex. 1, p. 2.)  Similarly, Sabre and Cadence agreed that, "[Sabre] shall not assign, convey, lease, sell, license, exchange or transfer any of the Collateral to any third party without the prior written consent of [Cadence] except for sales of inventory to buyers in the ordinary course of business."  (*Id*.)  Moreover, Cadence's rights upon default under the Commercial Security Agreement include the rights to "take possession of any Collateral in any manner permitted by law" and "to require [Sabre] to deliver and make available to [Cadence] any Collateral at a place reasonably convenient to [Sabre] and [Cadence]."  (*Id*. at p. 3.)

In addition, pursuant to the terms of the Loan and Security Agreement, Sabre, Holdings and Mr. Savage agreed that "[Sabre, Holdings and Mr. Savage] shall not lease, transfer, assign or otherwise dispose of title or possession of any of the Collateral."

---

[3]  The descriptions of collateral contained in the Security Documents are collectively referred to herein as the "Collateral."

4

(A.G. Oliver Affid., ¶ 6, Ex. 2, p. 5.)  Likewise, the parties agreed that, "if [Cadence] declares a default hereunder and so requests, [Sabre, Holdings and Mr. Savage] shall make all Collateral and records pertaining thereto available to [Cadence]," and that, "[Sabre, Holdings and Mr. Savage] agree … to immediately deliver to [Cadence], upon receipt by [Sabre, Holdings and Mr. Savage], any instrument, chattel paper document or other Collateral (other than goods) in which a security interest may be perfected."  (*Id*. at p. 6.)  What is more, Defendants and Cadence agreed that:

> In order to further secure the payment of the Secured Indebtedness, [Sabre, Holdings and Mr. Savage] hereby grant to [Cadence] a security interest and right to <u>setoff</u> against all of [Sabre's, Holdings's and Mr. Savage's] presently owned or hereafter acquired monies, items, credits, deposits and instruments (including certificates of deposit) presently or hereafter in the possession of [Cadence].  By maintaining any such accounts or other property at [Cadence], [Sabre, Holdings and Mr. Savage] acknowledge[ ] that [Sabre, Holdings and Mr. Savage] voluntarily subject the property to [Cadence]'s rights hereunder.  [Cadence] may exercise its rights under this Paragraph without prior notice following default.

(*Id*. at p. 10.)  (Emphasis added.)  Under the Loan and Security Agreement, Cadence's remedies upon default include the following:

> **Notice of Default.**  [Cadence] may give written notice of default to [Sabre, Holdings and Mr. Savage], following which [they] shall not dispose of, conceal, transfer, sell or encumber any of the Collateral (<u>including, but not limited to, cash proceeds</u>) without [Cadence]'s prior written consent.  <u>Any such disposition, concealment, transfer or sale after the giving of such notice shall constitute a wrongful conversion of the Collateral.  [Cadence] may obtain a temporary restraining order or other equitable relief to enforce [Sabre, Holdings and Mr. Savage]'s obligation to refrain from so impairing [Cadence]'s Collateral.</u>

(*Id*. at p. 12.)  (Emphasis added.)

On or about May 10, 2010, Cadence provided six letters to United States Government agencies ("Government") providing notice of the assignment of certain

contracts Sabre and/or Holdings had with the Government, and the proceeds thereof, to Cadence; the Government subsequently recognized the validity of the assignments and continued depositing the proceeds of said contracts directly into a Cadence deposit account. (A.G. Oliver Affid., ¶ 7.) The Note matured on September 30, 2010, and Sabre, Holdings and Mr. Savage failed to satisfy the obligations they owed to Cadence under the Note. (*Id*. at ¶ 8.)

On or about October 15, 2010, Cadence formally notified Sabre, Holdings and Mr. Savage that the loan obligations they owed to Cadence had matured, and demanded immediate satisfaction of all obligations owed by Sabre, Holdings and Mr. Savage to Cadence. (*Id*. at ¶ 9, Ex. 3, pp. 1-2.) On or about December 9, 2010, Cadence exercised its setoff rights as to its collateral in the form of funds maintained in Sabre's deposit account with Cadence. (A.G. Oliver Affid., ¶ 10.) On or about December 10, 2010, counsel for Cadence communicated to counsel for Sabre, Holdings and Mr. Savage that Cadence was exercising its right to demand that the proceeds of all Collateral be paid to Cadence. (*Id*. at ¶ 11.) Cadence's counsel also informed counsel for Sabre, Holdings and Mr. Savage that, "[w]e trust Sabre will not attempt to divert collections to another financial institution. I believe Cadence would consider that conversion." (*Id*.)

Upon information and belief, Sabre, Holdings and/or Mr. Savage currently retain in their care, custody or control, or shall soon be paid, significant sums, including but not limited to: (a) $5,999.23 (in the form of cash); (b) $10,853.22 (in the form of checks on hand); (c) $8,649.00 (in the form of credit card receivables); (d) $19,593.00 (in the form of payments received from Sabre's and/or Holdings's commercial, non-Government customers); (e) $280,102.93 (in the form of payments received from a Sabre and/or

Holdings customer, Steyr Mannlicher ("Steyr")); and (f) $21,622.38 (in the form of payments received from Sabre's and/or Holdings's commercial, non-Government customers). (*Id*. at ¶ 12.) All such sums appear to be the proceeds of the sale of Cadence's Collateral and/or the processing of Sabre's or Holdings's A/R. (*Id*.)

On or before January 1, 2011, Sabre, Holdings and/or Mr. Savage will be in possession of at least $338,170.38 that has been designated as proceeds of the Collateral securing the Note. (*Id*.) Upon information and belief, Sabre, Holdings Mr. Savage and/or their respective agents have actively sought new deposit accounts with other financial institutions in which to deposit the above-referenced funds in an effort to avoid Cadence's collection of its Collateral. (*Id*. at ¶ 13.) As of December 29, 2010, the amount of total indebtedness, less attorneys' fees and costs of collection, due and payable from Sabre, Holdings and Mr. Savage to Cadence is at least $1,725,018.21. (*Id*. at ¶ 14.)

Upon information and belief, Defendants are the targets of an ongoing investigation by the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") into the illegal sale of military rifles and/or rifle components, and in February 2010, the ATF raided Sabre's manufacturing facility, removed all computers and shut down operations. (*Id*. at ¶ 15.) Upon information and belief, in July 2010, the Government curtailed all shipments of ordnance from Sabre to the Government; such curtailment continued through the months of July, August, September, October and part of November; during this period, Sabre accrued millions of dollars in trade payables which remain unsatisfied (*Id*. at ¶ 16) Sabre is in active litigation with a trade payee, and, upon information and belief, Defendants are in default on their obligations to their principal equipment suppliers and lessors. (*Id*. at ¶¶ 17-18.) Upon information and belief, Defendants have

recently laid off most of their employees and, in any circumstance, appear unable to actually manufacture any ordnance. (*Id*. at ¶ 19.)

## **LAW AND ARGUMENT**

Cadence is entitled to the issuance of a temporary restraining order prohibiting Sabre, Holdings and Mr. Savage from disposing of, transferring, concealing, moving, dissipating, relocating, depositing into any account maintained with another financial institution, or in any other way diminishing the value of, the Collateral and the proceeds therefrom.

It is beyond doubt that "[t]he purpose of a [temporary restraining order] is to preserve the status quo so that a reasoned resolution of the dispute may be had." *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226 (6th Cir. 1996). An applicant may obtain a temporary restraining order if testimony, affidavits or a verified complaint clearly show that he or she will suffer immediate and irreparable injury, loss or damage. Fed. R. Civ. P. 65(b) (2010). In deciding whether to grant a temporary restraining order, courts consider four factors: (1) whether the party seeking the order has a strong likelihood of prevailing on the merits of the case; (2) whether the moving party will suffer irreparable injury if the order is not entered; (3) the potential harm the order would cause others; and (4) the public interest. *Id*.; *see Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000). "The four considerations applicable to [temporary restraining order] decisions are factors to be balanced, not prerequisites that must be met," *Six Clinics Holding Corporation, II v. CAFCOMP Systems*, 119 F.3d 393, 400 (6th Cir. 1997).

In addition, Rule 65(b) states, in pertinent part:

(1)    Issuing Without Notice.

8

The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:

> (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

> (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required

Rule 65(b) is an available remedy for lenders seeking to protect their collateral. *Advocate Capital, Inc. v. Law Office of A. Clark Cone, P.A.*, 2006 U.S. Dist. LEXIS 87303, *4-*5 (M.D. Tenn., Nov. 29, 2006) (copy attached). In *Advocate Capital*, the lender demonstrated a likelihood of success on the merits, did not present evidence sufficient to satisfy the irreparable harm or substantial harm factors, but did show that the public interest would be served by issuance of an injunction against a debtor who undeniably defaulted and failed to repay the loan. *Id.* at *5-*12.

## A.     Likelihood of Success.

Cadence will prevail on the merits of this case. "In order to establish a likelihood of success on the merits of a claim, a plaintiff must show more than a mere possibility of success." *Six Clinics*, 119 F.3d at 407. "However, it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair grounds for litigation and thus for more deliberate investigation." *Id.*

In the case *sub judice,* the Note, and the other loan documents executed in connection with it, is undeniably an enforceable contract or set of contracts between Cadence, Sabre, Holdings and Mr. Savage. *Advocate Capital*, 2006 U.S. Dist. LEXIS 87303 at *5. As in *Advocate Capital*, *id.*, Cadence has submitted incontrovertible

evidence that it loaned money to Sabre, that Holdings and Mr. Savage guaranteed the indebtedness, that the Note was secured by the Defendants' personal property—including but not limited to Sabre's and Holdings's A/R, as well as all proceeds of the Collateral—that Sabre defaulted by failing to satisfy its debt upon the maturity of the Note, that Cadence demanded payment in full from each Defendant, and that Sabre and each guarantor failed to satisfy the debt. (A.G. Oliver Affid., ¶¶ 4-6, 8-9, Ex. 1, pp. 1-5, Ex. 2, pp. 1-5, Ex. 3, pp. 1-17.) Accordingly, the "likelihood of success" consideration weighs in favor of, and Cadence is entitled to, the issuance of a temporary restraining order.

**B.      Irreparable Harm.**

Cadence will endure irreparable and unquantifiable harm if injunctive relief is denied, because Sabre necessarily concedes that a temporary restraining order is appropriate and money damages cannot fully compensate Cadence for Defendants' conversion of the Collateral. "'As a general rule, a movant has not established irreparable harm where damages would adequately compensate the movant for the asserted harm.'" *Performance Unlimited, Inc. v. Questar Publishers, Inc.,* 52 F.3d 1373, 1381 (6th Cir. 1995) (citation omitted). However, "[a]n injunction may issue to protect assets that are the subject of the dispute or to enjoin conduct that might be enjoined under a final order." *In re Fredeman Litigation,* 843 F.2d 821, 825 (5th Cir. 1988). What is more, "the possibility of dissipating assets so that funds no longer exist in order to compensate the [p]laintiff can establish irreparable harm." *Advocate Capital*, 2006 U.S. Dist. LEXIS 87303 at *7 (citations omitted).

Here, it is self-evident Cadence is entitled to the relief sought by the express terms of the Security Documents: Sabre itself contractually agreed that upon default, any

"disposition, concealment, transfer or sale after the giving of such notice shall constitute a wrongful conversion" of Cadence's Collateral, and that Cadence "may obtain a temporary restraining order or other equitable relief to enforce [Sabre]'s obligation to refrain from so impairing" Cadence's Collateral.  (A.G. Oliver Affid., ¶ 6, Ex. 2, p. 12.) By refusing to tender the $338,170.38 now or soon to be in Defendants' care, custody or control, Defendants are, *prima facie*, wrongfully converting Cadence's Collateral under the express terms of the Commercial Security Agreement.  (A.G. Oliver Affid., ¶ 12.)

Moreover, Cadence is entitled to an "irreparable harm" ruling on the merits. Defendants are actively converting Cadence's Collateral, and the proceeds therefrom— which, in the end, is the ultimate subject of the instant dispute—and this theft irreparably harms Cadence because it will be forever precluded from collecting the misappropriated Collateral.  Unlike the lender in *Advocate Capital*, 2006 U.S. Dist. LEXIS 87303 at *6- *10, Cadence has introduced evidence that its security interest is, in fact, being wrongfully converted:  Sabre, Holdings and/or Mr. Savage currently retain in their care, custody or control, or shall soon be paid, significant sums, including but not limited to at least $338,170.38 that has been designated as proceeds of the Collateral securing the Note.  (A.G. Oliver Affid., ¶ 12.)  All such sums appear to be the proceeds of the sale of Cadence's Collateral and/or the processing of Sabre's or Holdings's A/R.  (*Id*.)  Despite Cadence's demand for realization of its Collateral, pursuant to the Security Documents, Defendants have failed, and will fail, to deposit these funds and proceeds with Cadence and have actively sought new deposit accounts with other financial institutions in which to deposit the misappropriated funds in an effort to avoid Cadence's collection of its Collateral.  (*Id*. at ¶ 13.)  This malfeasance constitutes the permanent conversion of

11

Cadence's Collateral and the proceeds therefrom, because once fully disposed, the Collateral cannot be reacquired.

In addition, Cadence will suffer an injury, loss, or damage before the adverse parties can be heard in opposition, because absent a temporary injunction order, Sabre, Holdings and Mr. Savage can simply continue to dissipate Cadence's remaining Collateral and the proceeds of the Collateral any time they want, rendering Cadence's security interest worthless. Thus, the "irreparable harm" factor weighs in favor of, and Cadence is entitled to, the issuance of a temporary restraining order.

**C.** **Potential Harm to Others.**

Issuance of the temporary restraining order sought by Cadence will not harm the Defendants or any third parties. The substantial harm consideration "requires a court to balance the harm a plaintiff would suffer if its request for a [temporary restraining order] was denied with the harm the defendants would suffer if they were to be enjoined. It also requires a court to assess the impact a [temporary restraining order] might have on relevant third parties." *International Sec. Management Group, Inc. v. Sawyer*, 2006 U.S. Dist. LEXIS 37059, *22 (M.D. Tenn., June 6, 2006) (copy attached).

In the instant case, Cadence's injuries due to Defendants' actions wholly outweigh any possible harm to Defendants, because the temporary restraining order sought will merely ensure that Sabre, Holdings and Mr. Savage do not continue to convert Cadence's Collateral. First, Defendants are the targets of an ongoing investigation by the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") into the illegal sale of military rifles and/or rifle components, and in February 2010, the ATF raided Sabre's manufacturing facility, removed all computers and shut down operations.

(A.G. Oliver Affid., ¶ 15.)  Second, the safety of Sabre's products themselves has been called into question, when the Government stopped accepting or paying for Sabre products and effectively shut down Defendants' manufacturing capability.  (*Id*. at ¶ 16.) Third, while Sabre, Holdings and Mr. Savage were unable to sell to the Government from approximately July 2010 through approximately November 2010, Defendants experienced a large increase in trade payables.  (*Id*.)  Fourth, Sabre is in active litigation with a trade payee, and Defendants are in default on their obligations to their principal equipment suppliers and lessors.  (*Id*. at ¶¶ 17-18.)  Fifth, Defendants have recently laid off most of their employees and, in any circumstance, appear unable to actually manufacture any ordnance.  (*Id*. at ¶ 19.)  When reviewed in their totality, these facts suggest that in addition to converting Cadence's Collateral, Defendants will continue to ignore their obligations to secured and unsecured lenders and trading partners while illegally selling the tangible Collateral, much of which may not be safe to use for its designated purpose in the first place.  Therefore, issuance of a temporary restraining order will not harm any other secured or unsecured creditors, who are also not being paid, and the failure to afford Cadence relief will expose third parties to similar pecuniary losses.  Accordingly, the "potential harm to others" factor weighs in favor of, and Cadence is entitled to, the issuance of a temporary restraining order.

**D.  Public Interest.**

The public interest values the sanctity of contractual relationships, and failing to issue a temporary restraining order puts the public at risk of physical harm.  The public interest prong "asks whether the public interest is advanced in issuing" the order. *National Hockey League Players Ass'n v. Plymouth Whalers Hockey Club,* 372 F.3d 712,

720 n. 4 (6th Cir. 2003). In this case, the public has a plain and general interest in protecting and preserving the integrity of lending contracts like those between Cadence and the Defendants. *Advocate Capital*, 2006 U.S. Dist. LEXIS 87303 at *12.

Equally (perhaps more) important, a temporary restraining order in this case will protect the public's physical safety. The Collateral consists, in part, of Sabre's and Holdings's inventory: military- and commercial-grade firearms and firearms components. (A.G. Oliver Affid., ¶¶ 4-6, 8-9, Ex. 1, pp. 1-5, Ex. 2, pp. 1-5, Ex. 3, pp. 1-17.) This property secures the Note, but if Sabre, Holdings and Mr. Savage are permitted to convert the proceeds of this property, it is certain that they will continue to do so in a manner that cannot be accounted for. This circumstance creates the obvious hazards posed by a weapons manufacturer who tries to surreptitiously dispose of its products as quickly as possible; namely that sophisticated weapons will make their way into the hands of foreign and domestic actors who will use them to injure others. Thus, the "public interest" determination weighs in favor of, and Cadence is entitled to, the issuance of a temporary restraining order.

## CONCLUSION

For the foregoing reasons, Cadence should be granted a temporary restraining order prohibiting Cadence is entitled to the issuance of a temporary restraining order prohibiting Sabre, Holdings and Mr. Savage from disposing of, transferring, concealing, moving, dissipating, relocating, depositing into any account maintained with another financial institution, or in any other way diminishing the value of, the Collateral and the proceeds thereof.

Respectfully submitted,

**ERNEST B. WILLIAMS IV, PLLC**


 /s/Michael B. Schwegler
**ERNEST B. WILLIAMS, IV, BPR # 12301**
**MICHAEL B. SCHWEGLER, BPR # 22563**
P.O. Box 159264
Nashville, Tennessee 37215
Telephone: (615) 372-0993
Facsimile: 615) 371-1572
Email: erniewilliams@ewivlaw.com
        mikeschwegler@ewivlaw.com

**Attorneys for Cadence Bank, N.A.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served, via e-mail upon the following:

Jonathan Skeeters                        Bob Hannon
Bradley Arant Boult Cummings, LLP        Bradley Arant Boult Cummings, LLP
1600 Division Street                     1600 Division Street
Suite 750                                Suite 750
Nashville, Tennessee 37203               Nashville, Tennessee 37203
jskeeters@babc.com                       bhannon@babc.com

On this 3rd day of January, 2011.

I hereby certify that a true and correct copy of the foregoing was served, via U.S. Mail, first class postage prepaid, upon the following:

Sabre Defence Industries, LLC            Sabre Defence Holdings, LLC
450 Allied Drive                         450 Allied Drive
Nashville, Tennessee 37211               Nashville, Tennessee 37211

Jonathan Skeeters                        Jonathan Skeeters
Registered Agent for Sabre               Registered Agent for Sabre
        Defence Industries, LLC                  Defence Holdings, LLC
Bradley Arant Boult Cummings, LLP        Bradley Arant Boult Cummings, LLP
1600 Division Street                     1600 Division Street
Suite 750                                Suite 750
Nashville, Tennessee 37203               Nashville, Tennessee 37203

Guy Savage
450 Allied Drive
Nashville, Tennessee 37211

On the 4th day of January, 2011.


                                          /s/Michael B. Schwegler
                                         **MICHAEL B. SCHWEGLER**

16